J-S28031-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: K.A.P., JR., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: K.A.P. SR. | No. 16 MDA 2015 |

Appeal from the Order Entered November 19, 2014
In the Court of Common Pleas of Wyoming County
Civil Division at No(s): OCAD #2014-9

BEFORE:  BOWES, J., ALLEN, J., and LAZARUS, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED JULY 02, 2015**

K.A.P., Sr. (Father) appeals from the trial court's order involuntarily terminating his parental rights to his son, K.A.P., Jr. (Child) (born July 2005).[1]  After careful consideration, we affirm.

Child lived with his natural Mother, H.M.,[2] until he was removed from her home in November 2012.  At the time of Child's birth in 2005, Father was incarcerated for possession of a controlled substance (marijuana) and served a four-year sentence.  When Father was released from prison, he

---

[1] We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. ***In re A.R***., 837 A.2d 560, 563 (Pa. Super. 2003).  Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. ***Id.***

[2] In January 2015, Mother voluntarily agreed to the termination of her parental rights with regard to Child and signed a consent to adopt.

visited with Child and paid child support to Mother. In 2008, Father was arrested for possession of drug paraphernalia.

In 2012, Wyoming County Children and Youth Services (CYS), a division of Wyoming County Human Services, received a referral that Child was not enrolled in school and that there were concerns about Child's health. As a result, Child was placed in foster care in December 2012. Father was incarcerated, again, in 2012, for bank robbery, and sentenced to serve a 60-month prison term. Father is currently incarcerated and will be released in mid/late-2016. CYS created a service plan for Father, requesting he complete a parenting class and anger management class while in jail. Father voluntarily participated in and successfully completed parenting skills, drug and alcohol programs and violence prevention classes while he has been in prison. Father writes two to three letters each month to Child and regularly contacts CYS to inquire about Child's welfare.

In August 2013, Child was placed in a home with his current foster parents, who are prospective adoptive parents, and his four half-brothers.[3] On January 13, 2014, the court ordered a goal change to adoption. Seven months later, on August 22, 2014, CYS filed a petition to terminate Father's parental rights, citing the fact that "the minor child has been in placement for almost twenty (20) consecutive months" to support its petition. Petition for Involuntary Termination of Parental Rights, 8/22/14, at ¶3.

_____

[3] **See** separate appeal at 17-20 MDA 2015 (J.S28032/15).

On October 16, 2014 and October 24, 2014, the trial court held termination hearings. The court ultimately concluded that termination of Father's parental rights is warranted pursuant to 23 Pa.C.S. §2511(a)(2) where for a period of more than one year Father has failed to perform his parental duties and has caused Child "to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."

On appeal, Father presents one issue for our consideration: Whether the substantial competent evidence of record demonstrated that there was no basis for the granting of an involuntary termination of K.A.P., Sr.'s parental rights?

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). *See also In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under

23 Pa.C.S. § 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in 23 Pa.C.S. § 2511(b)).

Instantly, Father argues on appeal that the sole reason that the trial court terminated his rights to Child was based on the fact that he is incarcerated. Father acknowledges that Child is in a loving and stable environment with his prospective adoptive parents, who are also his current foster parents, however he does not want to relinquish his parental rights. Rather, he would be willing to have foster parents be Child's legal guardians, where Father could have frequent weekend visits with Child and be fully involved in his life.

Father was incarcerated at the time of the termination hearings, having been in jail for more than two years.[4] Father last saw Child three years ago, when Child was seven years of age. Prior to his incarceration, Father testified that he paid child support, would visit frequently with Child and did social things with him. N.T. Termination Hearing, 10/16/14, at 9. Father testified that since his incarceration, he writes Child 2-3 letters a month and Child has visited twice with him in prison. *Id.* at 11. CYS caseworker Manning verified that Father has sent child "numerous letters"

_____

[4] Father's criminal history dates back to 1999, when he was convicted of theft by unlawful taking, as well as reckless endangerment and resisting arrest. He served four years for that crime, being released in 2003. Father's current term of state incarceration, a result of bank robbery, will expire in January 2015, at which time he will be released to federal authorities and serve the remainder of his time in federal prison, which should expire in mid-2016.

via CYS and that she delivers the originals to Child's therapist or foster mother. N.T. Termination Hearing, 10/24/14, at 36. She also testified that since her first contact with Father after his 2012 incarceration, Father stayed in regular contact with her about Child, Father complied with securing the requested CYS services in jail, showed a genuine interest in Child's life, and had two visits with Child in jail. N.T. Termination Hearing, 10/24/14, at 58-59, 94. Father specifically testified that while he has been in prison he writes to CYS regularly, inquiring about Child's well-being, including Child's progress in school and mental health. N.T. Termination Hearing, 10/16/15, at 18. Finally, Father indicated that he voluntarily participated in and successfully completed parenting skills, drug and alcohol programs and violence prevention classes in prison. *Id.* at 19.

Father is expected to be released from prison in mid/later-2016, at which point he will be on federal supervision for two years. Father testified that he has a support system of family members upon his release from prison and a potential job as a die caster lined up upon his release. *Id.* at 13-14. Father indicated that he will comply in any way necessary with CYS upon his release from prison, stating, "I will do anything they tell me to do . . . I'll make the time [because] . . . my son is the most important thing in my life[.]" *Id.* at 24.

CYS caseworker Manning testified that at the time of the termination hearing Father had completed all goals requested by CYS and that the only concern she had about Father was "the fact that he's incarcerated." N.T.

Termination Hearing, 10/24/14/ at 59, 99, 101. She specifically indicated that she had concerns about his housing once he is released. *Id.* at 99.

In *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012), the Supreme Court held that incarceration neither compels nor precludes termination. Rather, incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under 23 Pa.C.S. § 2511(a)(2), where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied. While the fact that Father is incarcerated is not itself a ground for terminating his parental rights, an affirmative parental duty applies even if a parent is incarcerated. *In re B.,N.M*., 856 A.2d 847, 855 (Pa. Super. 2003) ("[A] parent's responsibilities are not tolled during incarceration."). An "affirmative duty . . . requires continuing interest in the child and a genuine effort to maintain communication and association with the child." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977). *See In re Adoption of Dale A., II*, 683 A.2d 297, 302 (Pa. Super. 1996) (court should focus on "whether the parent utilized those resources available while in prison to maintain a relationship with his child"); *see also In Interest of A.P.*, 692 A.2d 240, 245 (Pa. Super. 1997) ("fact of incarceration alone does not obviate the duty to exercise reasonable firmness under the circumstances to maintain a secure parent/child bond.").

While Father cannot "yield to every problem" that presents itself, he must take steps to maintain the relationship with Child, "to the best of his . . . ability, even in difficult circumstances." *In re B.,N.M.*, 856 A.2d at 855. Here, Father testified that while he has been incarcerated he writes 2-3 letters a month to Child. He also testified that he has voluntarily enrolled in and successfully completed several programs in prison to make himself a better person and father. While Father indicates that he wants to be able to make any decisions regarding child's care and upbringing, he also concedes that Child's foster family is "loving [and] stable" and that Child is doing well there. N.T. Termination Hearing, 10/16/15, at 33. Father also acknowledged that taking Child out of his foster home will "mess him up a little bit . . . [and] give him a setback." *Id.*

Here, Father seems to want the best of both worlds. He acknowledges that foster parents provide Child with a loving, stable home life and one with more opportunities and privileges than he will ever be able to provide Child. While he does not want to remove Child from his foster home where he resides with loving foster parents and four half-brothers, he also does not want to give up his right to have two weekend overnight visits a month with Child and the flexibility of attending Child's sporting and social events at his discretion. N.T. Termination Hearing, 10/16/14, at 43-44. Father wants to be able to call Child whenever he pleases, have him for holidays and drop him off and pick him up at school. *Id.* at 51. Father also wants to be involved in making decisions for Child. *Id.* at 52. He testified that he would

consent to foster parents becoming Child's legal guardian, as long as he could retain his parental rights to Child. *Id.* at 53.

Foster mother testified that she discussed an open adoption[5] with Father in which Father would still retain contact with Child, but on a limited basis such as supervised visits two hours a month. N.T. Termination Hearing, 10/24/14, at 141. Foster Mother also told Father that she would have no objection to him attending Child's sporting events and that he could contact Child on the telephone through her. *Id.* at 144. Father, however, testified that two hours a month was not enough time for him to spend with Child.

While we can certainly understand Father's reluctance to relinquish his parental rights to Child in the hopes of retaining the ability to see Child whenever he so chooses and in order to continue to make life decisions for Child, Father cannot overlook the fact that Child's life "simply cannot be put on hold in the hope that [he] will summon the ability to handle the responsibilities of parenting." *In re Z.P.*, 994 A.2d 1108, 1125 (Pa. Super. 2010). Father has been incarcerated on and off for half, if not more, of

_____

[5] We direct the parties to "Act 101" (eff. 4/25/2011) and 23 Pa.C.S. §§ 2731-2742, which provide an option for prospective adoptive parents and birth relatives to enter into a voluntary agreement for ongoing communication or contact that is in the best interest of the child. When the child is 12 years of age or older, however, his or her consent to the agreement is required. 23 Pa.C.S. § 2734. Moreover, to be legally enforceable, the agreement must approved by the court on or before the date of the adoption decree. 23 Pa.C.S. §§ 2735(c), 2738(c).

Child's life. Although Father provided child support for two years and visited with Child during the periods he was not incarcerated, he has never resided with Child. The fact that Father has been unable to fulfill his parental duties to Child cannot be factually disputed. As we acknowledged in *In re B., N.M.*, *supra*, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *Id.* at 865.

We commend Father for his diligent letter writing efforts to Child while in prison, as well his contacting CYS for updates on Child's welfare. We also credit the fact that Father loves Child and wants to remain a part of his life. However, Father's parental duties to provide Child with a permanent, stable and healthy environment have not been tolled during his periods of incarceration. The fact that Father has made poor choices in life, which have resulted in his repeated incarcerations, is a legitimate, determinative factor in the court's decision to terminate his parental rights under section 2511(a)(2). *In re S.P.*, *supra*.[6] Because the court's decision is supported by the record, we must affirm. *In re R.J.T.*, 9 A.3d 1179 (Pa. 2010).

_____

[6] Although not raised by Father on appeal, we find that the court's conclusion, that termination was proven under section 2511(b), is supported by the record. Father's continual confinement has essentially negated any bond he had with Child during the minority of Child's life when he was not in prison. *See In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008) (no parent-child bond worth preserving where child has been in foster care for most of child's life and resulting bond with parent is attenuated). It is particularly
*(Footnote Continued Next Page)*

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/2/2015

*(Footnote Continued)* ————————

telling that Child's last memory of Father, as related by a CYS caseworker, is seeing Father's face on the television when he had been arrested in 2012. N.T. Termination Hearing, 10/24/14, at 40.